JOHN S. LEONARDO
United States Attorney
District of Arizona
JACK SMITH
Chief
Criminal Division, Public Integrity Section
U.S. Department of Justice

GARY M. RESTAINO
Arizona State Bar No. 017450
JAMES R. KNAPP
Arizona State Bar No. 021166
Assistant U.S. Attorneys
District of Arizona
40 N. Central Avenue
Phoenix, Arizona 85004
Telephone (602) 514-7500
Gary.Restaino@usdoj.gov
James.Knapp2@usdoj.gov

DAVID V. HARBACH, II
Texas State Bar No. 24008592
Deputy Chief
SEAN F. MULRYNE
New Jersey State Bar No. 027052008
Trial Attorney
Public Integrity Section, Criminal Division
U.S. Department of Justice
1400 New York Ave, NW, 12th floor
Washington, D.C. 20005
Tel: (202) 514-1412
David.Harbach@usdoj.gov
Sean.Mulryne@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Richard G. Renzi,<br><br>Defendant. | CR-08-212-TUC-DCB (BPV)<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The United States of America, by and through the undersigned attorneys, files this sentencing memorandum to assist the Court in fashioning an appropriate sentence in light of the factors in Title 18, United States Code, Section 3553(a).

## **Introduction**

Members of the United States Congress wield tremendous power. Defendant Richard G. Renzi abused that power to extort private citizens he was supposed to serve. After a five-week jury trial, Renzi stands convicted of racketeering, conspiracy, honest services fraud, attempted extortion, extortion, money laundering, mail and wire fraud, and lying to insurance regulators. This array of crimes is the result of years of Renzi's profligate abuses: abuse of power, abuse of trust, abuse of clients, abuse of colleagues, abuse of subordinates, and abuse of office. Renzi's pattern of criminal behavior, further littered by his attempts to cover it up or blame others, denigrates the office he held as well as our political system at large, and deserves a substantial sentence in prison.

As discussed below, although the properly-calculated Guidelines range in this case is substantially in excess of the 97 to 121 months the probation officer calculated before applying an unwarranted ten-level downward departure, the Government believes that a sentence that is sufficient but not greater than necessary to achieve the objectives of section 3553(a) is 9 to 12 years in prison. [1]

/ / /

/ / /

/ / /

/ / /

/ / /

---

[1] The Probation Officer also recommended a $20,000 fine, but the recommended fine fails to take into account Renzi's substantial assets, including the two large properties identified in the Draft PSR (¶ 80), as well as the access Renzi has to additional funds, including as the Executor of the residual trust from his father's estate and as the spouse of the owner of Patriot Insurance Agency. Given Renzi's continued access to funds, a fine in the middle-to-high end of the range is reasonable. Using the analog to the Government's recommended prison term of 9 to 12 years (roughly equivalent to offense level 31), the fine range for defendant Renzi is $15,000 to $150,000. The Government accordingly recommends a fine of $100,000 to account for Renzi's pattern of misconduct.

**Sentencing Factors in Title 18, United States Code, Section 3553(a)**

## I. The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1) (first clause))

### A. Renzi's Extortion Spree

In January 2005, Renzi was a newly-reelected Congressman about to begin his second term. Renzi was a former business partner of Jim Sandlin, and Sandlin owed Renzi $700,000 on a promissory note executed on May 20, 2004. In this timeframe and throughout the extortion scheme, Renzi faced a continual money crunch, for reasons ranging from the financial burdens associated with a large bi-coastal family, to the Lighthouse note arising out of North Island Facilities' demand to have a responsible backer following the misappropriation of insurance premiums, to the additional taxes that would be necessitated by the amended returns to fix Renzi's FEC problem.

Also in early 2005, Resolution Copper Company was interested in re-approaching Mr. Renzi about sponsoring a land exchange to enable Resolution to acquire the surface rights above an extremely valuable copper ore deposit near Superior, Arizona.

Resolution Copper representatives including Bruno Hegner and Tom Glass met with Renzi in Phoenix in January 2005, explained their interest in putting together a land swap, and outlined for Renzi some of the details of the package they had put together, which already included several environmentally significant parcels. Renzi promptly told them they should add Sandlin's property to their package because retiring its water use would be good for the San Pedro River and Fort Huachuca, but that was not the whole story. Renzi concealed from Resolution that he had a business relationship with Sandlin, that he and Sandlin had been business partners, and that Sandlin owed him some $700,000.

About a month later, in February 2005, while Hegner, Glass and other Resolution Copper personnel were in Washington, D.C., Renzi summoned them to his office. At that meeting, Glass was concerned about a possible business relationship between Renzi

and Sandlin, so he asked Renzi about it. Renzi got angry and told them that he had sold a piece of property to Sandlin a few years back, but that was it. Renzi, who at the time knew full well why Glass brought it up, acted insulted that they had even asked the question. When asked at trial if he was satisfied with Renzi's answer, Hegner, who was the effective decision maker at Resolution as far as the land swap was concerned, testified, "I thought about it when I was in the cab going out to the airport and just finally decided that – this man is a United States Congressman, if he says there is no relationship, that is good enough for me." (5/14/13 Tr., Doc. 1255, at 31-32). Renzi's indignation and the prestige of his office had sold his lie.

After weeks of difficult negotiations with Sandlin, Hegner explained the difficulties to Renzi over the phone, after which telephone call Renzi contacted Sandlin, and Sandlin reached out to Hegner to profess willingness to cooperate. But it did not work out. Several more weeks passed without agreement, and by mid-April Renzi had had enough. He called Hegner and told him flatly, "No Sandlin property, no bill." Shortly afterward, Hegner learned of Renzi's business relationship with Sandlin via corporate records unearthed by a consultant. Hegner decided at that moment that Resolution would not include Sandlin's property in its package, no matter the cost to the land exchange: "[W]hen I talked to the senior members of the management committee for the joint venture, I just said, you know, we can't purchase this parcel, and advised them that this may stop the land exchange dead in its tracks, but that is what we're going to do." (5/15/13 Tr., Doc. 1256, at 40).

From the night before the phone call to Hegner, when Renzi and Sandlin spoke for twenty minutes, and throughout the several days following it, Renzi and Sandlin spoke at length on the telephone. In the midst of those conversations, Renzi had a meeting that presented another opportunity to extort and exploit to his and Sandlin's advantage. Like Resolution Copper, Phil Aries' investment group, Preserve Petrified Forest Land Investors, had put together a lands package, and like Resolution, they were looking for a

sponsor for their bill. At a meeting with Aries only four days after he had laid down the law with Hegner, Renzi tried the carrot instead of the stick. Renzi told Aries he had a "free pass" out of the natural resources committee, and communicated in no uncertain terms that if the Aries group included the Sandlin property, they would also get the benefit of the free pass out of committee. As Renzi surely knew, getting a bill out of then-Chairman Pombo's committee was among the most difficult steps in successfully completing a land exchange, and unsurprisingly the carrot worked. The Aries group immediately set about attempting to buy Sandlin's property, and they were more willing to accede to Sandlin's demands than Resolution Copper was.

Before long the Aries group and Sandlin had reached an agreed sales price of $4.6 million, including $1 million earnest money due up front.[2] The same day the Aries group paid Sandlin the $1 million down payment, Sandlin cut Renzi a check for $200,000, making the check out to "Renzi Vino." Two weeks later, Renzi deposited the check not in Renzi Vino's account, not even in his personal account, but in the account of Patriot Insurance. After the down payment went across but before spending millions more at closing, Guy Inzalaco, one of Aries' investors, wanted to be sure that if they bought the Sandlin property and included it, then the land exchange would move forward as Aries told him Renzi had promised. Inzalaco called Renzi and Renzi assured him of exactly that.

At closing a few months later, the remaining $3.6 million coming to Sandlin was to be in the form of $1.6 million in cash and a $2 million loan. But not long before that happened, and fully aware that he was about to get $1.6 million in cash within weeks, Sandlin took out a $1 million loan from a retired couple in Texas. At the closing on that

---

[2] The $4.6 million price also included $100,000 Sandlin subsequently demanded for an extension of the escrow period.

loan, Sandlin directed the title company to send $533,000 of the loan proceeds – what was left of his debt to Renzi – to Patriot Insurance.

The same day, Renzi opened a new account called the "Rick Renzi Rain Whisper" account – a sham account for a nonexistent "business" – and transferred the $533,000 from the Patriot account into it. Then, over course of several months, Renzi moved that money out of the Rain Whisper account into his personal account – not all at once, but piecemeal.[3] Later, Renzi needed to make a big withdrawal, because he had a $250,000 tax bill to pay because of the "reconstruction" for which he paid Watkins to solve his FEC problem. So, Renzi took out all that was left in the Rain Whisper account (about $325,000), but via a needlessly roundabout method. First, he transferred $325,000 from Rain Whisper back to a Patriot account. Then he waited a month. Then he transferred $325,000 from the Patriot account to a different Patriot account, and the same day from that second Patriot account to his personal account.

Renzi and Sandlin's efforts to hide what they had done did not stop with money laundering, however. In the fall of 2006, when a reporter started asking questions, Sandlin and Renzi concocted a story that it was the Nature Conservancy, and not Renzi, who had insisted that Sandlin's property be included in the land exchange. During this time Sandlin hounded Aries about getting back to the reporter to so explain the story, as Renzi had instructed him to do.

### B. Renzi's Raiding His Insurance Company to Fund His Campaign for Congress

Following the decennial census in 2000, an opportunity arose for Renzi to run for office in Arizona, in a newly-formed Congressional District. In 2001, he took steps to relocate his insurance business (Renzi & Co.) to Arizona, in an effort to get name

[3] He even gave $50,000 of this dirty money to a parish church in Sierra Vista, thus expanding his own legacy at the expense of his victims.

recognition. As the jury found, Renzi subsequently used the insurance business as a racketeering enterprise.

Faced with steep hurdles in running for office after spending many years away from Arizona, Renzi needed campaign cash. Starting in December 2001, he saw an opportunity to divert and misappropriate the insurance premiums paid by hundreds of small, local non-profits into his campaign account, and he seized the opportunity and deposited the premiums into his campaign. For the next eleven months, Renzi & Co. never had enough cash to pay the premiums, until the receipt of approximately $236,000 from Renzi's father, following Renzi's election to office.

In the interim, Renzi avoided his obligations to his insurance customers and the underwriters with whom he contracted. Through his employees (whose every action Renzi directed or approved) Renzi took a number of steps to improve his position at the expense of others. He took non-profits off the bordereau lists (thereby reducing the amount Renzi & Co. owed the underwriters but exposing the non-profits to risk of claim denials). He manufactured a coverage dispute with Safeco arising out of Safeco's refusal to reimburse the costs of responding to a regulatory subpoena – even though he subsequently admitted to Safeco's broker, North Island Facilities ("NIF"), that it was a "fair denial." He ignored NIF's demands for payment, and never informed NIF that he simply did not have the money because he spent it on his campaign.

By the summer of 2002, Renzi's criminal conspiracy and racketeering activity was in full swing. Faced with having to explain the cancellation notices Safeco sent to his customers, Renzi dictated a letter falsely telling customers he had found them new insurance with Jimcor, notwithstanding that Jimcor neither underwrites insurance nor provides much coverage outside the mid-Atlantic states. To further keep his customers in the dark about the truth, he had Renzi & Co. pay insurance claims directly, rather than send the claims to Safeco where they would likely have been denied due to the cancellation of coverage.

When state regulators got wind of the Jimcor letters and started asking questions, Renzi directed Andrew Beardall, his law school classmate, to fix the regulatory inquiries, and in the process the two sent inconsistent letters in November and December, one to customers promising that Safeco had been replaced, and the other to regulators saying that Safeco had been providing coverage all along. The December letter to regulators further falsely represented all of the crisis pregnancy centers were covered, when in fact many of them had been removed from the bordereau list by Aly Gamble at Renzi's direction.

In March 2003, in order to try to cover up the lies he had told his customers in the summer 2002 Jimcor letters, Renzi piled on more lies, this time to Virginia and Florida insurance regulators. He falsely told them that the statements to his customers in those letters were the product of Aly Gamble's "inadvertent computer slip," when in fact he had dictated them to her.

In June 2006, with another election looming, Renzi used Beardall to persuade Dan Mogelnicki of NIF into unwittingly writing a letter for Renzi – of course without telling Mogelnicki about Renzi's lies to the customers or the insurance regulators – that falsely mischaracterized Renzi's crimes as a mere business dispute.

## II. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1) (second clause))

Rick Renzi is the son of an American patriot. He is a law school graduate. He worked for an honorable Member of Congress. Simply put, he knew better than to fleece his own insurance company to fund his run for Congress and to subsequently exploit his elected position for personal gain.

Moreover, Rick Renzi continues to blame others and deny any personal responsibility for his actions. It is well-settled that lack of remorse is properly considered by the Court in its section 3553 analysis. *See, e.g., United States v. Smith*, 424 F.3d 992, 1016-17 (9th Cir. 2005) (approving district court's above-Guidelines sentence in a tax

protestor fraud case based in part on defendant's lack of remorse) ("That the district court considered Smith's lack of remorse in sentencing him is by no means a novel concept."); *United States v. Hilgers*, 560 F.3d 944, 946-48 (9th Cir. 2009) (same, with respect to a "master manipulator" mortgage broker); *United States v. Keskes*, 703 F.3d 1078, 1090-91 (7th Cir. 2013) (fraud case; "A lack of remorse is a proper sentencing consideration 'because it speaks to traditional penological interests such as rehabilitation (an indifferent criminal isn't ready to reform) and deterrence (a remorseful criminal is less likely to return to his old ways).'" (citation omitted)); *United States v. Cruzado-Laureano*, 527 F.3d 231, 236-37 (1st Cir. 2008) (rejecting argument that including lack of remorse in section 3553 analysis was unfair "double counting" where court also denied downward offense level adjustment for acceptance of responsibility); *United States v. Mitchell*, 681 F.3d 867, 884-85 (6th Cir. 2012) (bribery case; distinguishing lack of remorse from exercise of trial right, where defendant persisted in denying his involvement following jury verdict).

In the instant case, Renzi has displayed a consistent and craven avoidance of responsibility. In his insurance business, he first blamed Safeco for the claim denial and then Aly Gamble for the Jimcor letters. He subsequently had a sufficient falling out with Beardall for Beardall to warn Kimberly Kepler that Renzi's house of cards was falling. He manipulated Dan Mogelnicki into writing a helpful letter, and even expressed umbrage at having to repay Art Seifert of Lighthouse for the favorable service Lighthouse had provided following the criminal misappropriation of funds. In none of the evidence introduced at trial or produced in the discovery in this matter did Renzi ever apologize to his customers, his underwriters, or his other business colleagues. There was no apology, no remorse, then or now.

Renzi continued his blame game as the insurance dispute turned into an FEC dispute that threatened his seat in Congress. Dissatisfied with the flow-through losses posted by his first accountant (and notwithstanding his prior directives to that accountant

about the importance of flow-through losses), Renzi browbeat a second accountant, Robert Scott, into re-defining certain commonly-understood accounting terms. And when Scott's returns placed Renzi in jeopardy for concealing a conflict, he turned to a third accountant, Robert Watkins, to reconstruct the books.

Renzi also blamed others as a Member of Congress. He blacklisted Tom Glass after Glass guessed at the depths of the Sandlin relationship. He claimed Bruno Hegner and Phil Aries misunderstood his clear extortionate directives and promises. He blamed his office staff for filing the earlier Congressional financial disclosure statements that conflicted with the later statement base on Watkins' "reconstructed" numbers.

At trial, the song remained the same. He added a new reason to throw Aly Gamble under the bus, this one focusing on the difference between a "binder" and a "certificate of insurance." And most tellingly, this experienced businessman who has a law degree, who was well-versed in the nuances of sweep accounts and flow-through losses, and who ran the finances of his insurance business with a micromanaging iron grip, asked his fixer to testify at trial that he didn't really understand his business dealings.

The Government anticipates that Renzi may direct the Court to his positive accomplishments as a Congressman. Renzi served three terms in Congress and on some occasions may actually have served the interests of his District (including the members of the several Indian tribes in Congressional District 1) and of Arizona as a whole (including the various efforts to assist Fort Huachuca and the San Pedro River). But service to the District and the State are the bare minimum expectations of a Member of Congress, and the provision of some bare minimum of honest services does not in any manner counterbalance the creation and implementation of a scheme and artifice to deprive

constituents of their intangible rights to honest services elsewhere.[4] *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (in assessing import of voluminous letters touting public official defendant's good works as a legislator, such letters "reflect[ ] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants.").

More generally, good works and charitable contributions are ordinarily not a proper basis for a lower sentence. Part of the reason for this is that it could work an unfair advantage for wealthy defendants, as many white-collar defendants are:

> to allow any affluent offender to point to the good his money has performed and to receive a downward departure from the calculated offense level on that basis is to make a mockery of the Guidelines. Such accommodation suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced. The very idea of such purchases of lower sentences is unsavory, and suggests that society can always be bought off, even by those whose criminal misconduct has shown contempt for its well-being.

*United States v. McHan*, 920 F.2d 244, 248 (4th Cir. 1990); *see also United States v. Peppel*, 707 F.3d 627, 640-41 (6th Cir. 2013) (reversing overly-lenient sentence for prominent businessman who pled guilty to securities fraud and money laundering; "[T]here is nothing to indicate that the support provided by Peppel to his family, friends, business associates, and community is in any way unique or more substantial than any

---

[4] Indeed, above and beyond the institutional harm caused by his corrupt actions, Renzi single-handedly delayed the Resolution Copper land exchange. We do not suggest that Renzi bears all responsibility for the delay, but the stench attached to the bill by his criminal conduct certainly contributed to the stalled efforts to protect the environment through exchanged land and the safety of the Superior community through the acquisition of surface rights around the copper mine.

other defendant who faces a custodial sentence. Further, Peppel's status in the community and chosen profession cannot alone be the basis for such a conclusion."); *United States v. Morken*, 133 F.3d 628 (8th Cir. 1998) (downward departure reversed for businessman who performed substantial community service and raised money for charity, on grounds that it was "neither exceptional nor out of the ordinary for someone of his income and preeminence"); *United States v. Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("Wealthy people commonly make gifts to charity. They are to be commended for doing so but should not be allowed to treat charity as a get-out-of-jail card.").

## III. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Deter Criminal Conduct (18 U.S.C. § 3553(a)(2)(A)-(B))

The substantial prison sentence the Government recommends in this case is a reflection of how serious Renzi's crimes are and the acute need for sustained general deterrence, especially of late.

Although the mainline corruption offenses drive the Guidelines in this case, it is important to remember that Renzi stands convicted of not only them, but also serious crimes for ransacking insurance premiums to fund his own Congressional campaign and then lying about it, both to his clients and to insurance regulators. The very funding that allowed him to win the seat in Congress that he corrupted was itself the proceeds of criminal conduct, to the tune of hundreds of thousands of dollars. Indeed, any one of the crimes Renzi committed – fraud, extortion, money laundering – is serious. Renzi's having committed all of them, across two schemes and under the umbrella of a racketeering enterprise, puts him in a league of extremely serious white collar offenders. That he carried out the first scheme to get elected to Congress and the second while serving in Congress makes his criminal resume that much worse.

The power that Members of Congress hold only underscores the necessity of a serious sentence to promote respect for the ***law*** that most keenly applies to them.

Relatedly, deterrence is especially important in white-collar cases, and acutely so in corruption cases. A judge in Illinois eloquently explained the reasons for this:

> We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all – not only to the average citizen, but to all elected and appointed officials.

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006).

Furthermore, as another judge recently explained in the sentencing of former Governor Blagojevich, assessing deterrent value is not as simple as asking whether a defendant would be willing to commit a particular crime if the price were a certain number of years in prison:

> The problem with deterrence always is that you have not only the price to be paid if you are caught, but the chances of your being caught. And while economists know how to discount this probability, we don't have reliable statistics on the good way to do it. If you are a corrupt public official and you are an optimist, there's a much better chance you're going to do it than if you're a pessimist. So the issue of who would trade 5 years in prison to be corrupt or 10 to 20 years, whatever the figure is, is not the question that we are supposed to ask.

Transcript of Sentencing, doc. 1036, at 243-44, *United States v. Blagojevich*, No. 08 Cr. 888, (N.D. Ill. Dec. 7, 2011).

No less than in *Spano*, *Blagojevich*, or any of the other high-profile corruption cases in recent years, a substantial sentence is necessary in this case to as best as possible deter similar conduct by sending the message that such criminal activity, especially by elected officials, will not be tolerated or treated lightly.

**IV. The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant (18 U.S.C. § 3553(a)(2)(C))**

This factor is seldom on the incarceration side of the ledger in a public corruption case. Clearly, Renzi is unlikely to run for, or be elected to, public office in the future. But Renzi does arrive at his sentencing as a small businessman of many years, and he has ample opportunity to create new scams in the future.

Indeed, Renzi continues to work in the insurance industry, although he calls himself a consultant rather than a stakeholder. But Renzi continues to call the shots for Patriot Insurance Agency and Spirit Mountain Insurance Company, which gives him control of both the significant surplus to be used to pay claims as well as the incoming premium checks from customers. Renzi remains a risk to the insureds as well as to the regulatory community.

In this regard, Renzi's objections to the PSR are telling. Renzi objects to paragraph 78, which attributes a $30,000 monthly income to him. He contends that instead it goes to his wife, and that he has merely "provided informal assistance with the management of Patriot Insurance Agency, Inc. ***at times*** since 2009." (Doc. 1300 at 10 (emphasis added)). That Renzi goes out of his way to marginalize his continued and consistent control over all facets of the business shows him to be in complete denial. Incarceration for a significant term will help safeguard the public.

**V. The Properly Calculated Guidelines Range and Policy Statements of the Sentencing Commission (18 U.S.C. § 3553(a)(4)-(5))**

As more fully discussed in the Government's objections to the Draft PSR (Docs. 1301, 1305), the correct Guidelines offense level is substantially in excess of the level 30 determined by the probation officer, using a value enhancement of $200,000. (Draft PSR

¶ 58). This is true whether the Court agrees that $4.6 million is the appropriate valuation (in which case the offense level would be 38, resulting in a Guidelines range of 235-293 months in prison), or $2,098,829 (in which case the offense level would be 36, resulting in a Guidelines range of 188-235 months in prison), or $733,000 (in which case the offense level would be 34, resulting in a Guidelines range of 151-188 months in prison).

The conduct driving the Guidelines calculation is a heartland corruption offense, and it is only a fraction of the conduct of which Renzi stands convicted. The fact that the insurance-related crimes do not affect the Guidelines range in no way means that the Court should disregard them. Moreover, the Government's prior analysis establishes that the facts of this case do not remotely warrant a Guidelines-based departure. (Doc. 1301 at 8).

The seriousness with which the Sentencing Commission takes public corruption offenses is reflected not only in the Guidelines themselves, but in the associated statements the Commission made in amending them in 2004. Indeed, part of the reason for the amendments was to underline "the Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses." *See* U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 666, at 82. The Commission increased the base offense level for public officials because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental processes." *Id.*

These policy statements by the Sentencing Commission put a fine point on what common sense tells most Americans: corrupt public officials inflict real damage to the precious core of trust that comes with the privilege of being elected to serve the public. As stated by one district judge:

> Most importantly, Ganim's sentence reflected the extraordinary harm done to the political system of the City of Bridgeport and beyond. Government corruption breeds cynicism and mistrust of elected officials. It causes the

> public to disengage from the democratic process because, as the Court stated at sentencing, the public begins to think of politics as "only for the insiders." Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, No. 3:01cr263 (JBA), 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (unpublished opinion declining to re-sentence post-*Booker*), *aff'd*, 510 F.3d 134 and 256 Fed. Appx. 399, 402-03 (disapproving of mitigation, as "there is no exception for corruption for the good mayors"). Corrupt public officials are intolerable in and repugnant to a healthy democracy. The Guidelines suggest significant sanctions for such offenders, and in the Government's view, that is appropriately so.

Nevertheless, every case merits an individualized assessment, and here the Government believes that a sentence of 9 to 12 years is sufficient, but not greater than necessary, to vindicate society's interest in punishing corruption.

## VI. The Need to Avoid Unwarranted Sentence Disparities (18 U.S.C. § 3553(a)(6))

The Court is required to also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." *See* 18 USC § 3553(a)(6). "Congress's primary goal in enacting section 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) (quoted in *United States v. Saeteurn*, 504 F.3d 1175, 1181 (9th Cir. 2007)). The relative culpability of co-defendants can be addressed through other 18 U.S.C. § 3553 factors. *See Saeteurn*, 504 F.3d at 1181-83 (holding that district court properly considered co-defendants' relative culpability under 18 U.S.C. § 3553(a)(1)).

Clearly the focus at sentencing is on the individual before the Court. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes

mitigate, sometimes magnify, the crime and the punishment to ensue."). Nonetheless, in order to promote national uniformity, the Court may consider federal[5] sentences for other defendants involving similar conduct, regardless of the district in which the sentence was imposed. *United States v. Sanchez-Martinez*, No. 12-50309, 2013 WL 4008186 at *1 (9th Cir. Aug. 7, 2013) (unpublished) (district court's consideration of the court's own spreadsheet of sentences in similar cases was not error). There are practical limits to this, of course: a district court "cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before." *United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010).

Below is a sampling of recent federal public corruption sentences following convictions at trial against high-level elected officials across the country.[6]

> *United States v. Rod Blagojevich*, CR08-0888 (N.D. Ill. 2011), *appeal pending*, No. 11-3853 (7th Cir.) (governor convicted at second trial on counts including honest services fraud, extortion and conspiracy to commit bribery; sentenced to 168 months);
>
> *United States v. James C. Dimora*, 10-CR-387 (N.D. Ohio 2012), *appeal pending*, No. 12-4004 (6th Cir.) (elected County Commissioner convicted at trial of racketeering, bribery, and extortion; sentenced to 336 months);

---

[5] The concern is with uniformity of federal sentences; the Court is not required to consider state court sentences for similar conduct. *See United States v. Ringgold*, 571 F.3d 948, 951 (9th Cir. 2009).

[6] In selecting broadly comparable cases, we omit as inapposite those public corruption defendants sentenced pursuant to plea agreements and following the acceptance of responsibility. *See, e.g. United States v. Ressam*, 679 F.3d 1069, 1094-95 (9th Cir. 2012) (holding that a 22-year sentence following a jury conviction for a terrorism offense was insufficient, and rejecting as comparators under section 3553(a)(6) those defendants sentenced pursuant to plea agreements). We also omit federal public corruption cases in Arizona involving unelected officials, such as border agents who conspire to smuggle drugs into the country. *See, e.g. United States v. Michael Angelo Atondo*, CR11-691-PHX-SRB (96 months following conviction); *United States v. Luis Carlos Vasquez*, CR11-2486-TUC-DCB (151 months following conviction).

*United States v. Phillip A. Hamilton*, 11 Cr. 13 (E.D. Va. 2011), *aff'd*, *United States v. Hamilton*, 701 F.3d 404 (4th Cir. 2012) (elected state legislator convicted at trial of bribery and extortion; sentenced to 114 months);

*United States v. William J. Jefferson*, 07 Cr. 209 (E.D. Va. 2009), *aff'd in part and vacated and remanded in part*, *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) (Congressman convicted at trial on counts including honest services fraud, bribery and racketeering; sentenced to 156 months);

*United States v. George H. Ryan*, 02 Cr. 506 (N.D. Ill. 2006), *aff'd sub nom. United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) (governor convicted at trial on racketeering and tax charges; sentenced to 78 months).

The Government offers these examples to illustrate the increasingly serious sentences that federal courts have recently handed down in public corruption cases. In this case similarly involving abject abuse of high public office, the Government's recommendation of 9 to 12 years in prison is well within the range of such sentences, and would not result in any unwarranted sentence disparity.

**VII. The Need to Provide Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7))**

The government does not seek restitution in this case, because the victims do not seek restitution. It should come as no surprise that none of the identified victims in this case submitted restitution claims. The political nature of the underlying disputes would generally cause any cautious businessman to stay out of the fray, and these particular businessmen were treated shabbily by the defense at trial. Moreover, the direct and proximate harm arising out of the attempted extortion of Resolution Copper and the regulatory fraud with respect to the debt to NIF would be difficult to quantify. And although Guy Inzalaco can quantify a loss (that is, his $1.3 million stake in the venture minus the $10,000 for which he sold his stake to Shawn Lampman), that loss, too, could

run into causation disputes. But even in the absence of restitution, the trial testimony establishes the anxiety, the grief and the harm Renzi caused to the victims in this matter.

**VIII. Conclusion**

For the foregoing reasons, the Government recommends a sentence for defendant Renzi of 9 to 12 years in prison, accompanied by a fine of $100,000. Although this recommendation is admittedly quite generous since the correctly-calculated Guidelines prescribe much higher ranges, the Government believes this sentence is sufficient but not greater than necessary to effectuate the sentencing objectives set forth at 18 U.S.C. § 3553.

Respectfully submitted this 21st day of October, 2013.

JOHN S. LEONARDO
United States Attorney
District of Arizona

By: /s/ Gary M. Restaino
Gary M. Restaino
Assistant U.S. Attorney

JACK SMITH
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: /s/ David V. Harbach, II
David V. Harbach, II
Deputy Chief

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of October, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel of record.

/s/ Gary M. Restaino
Gary M. Restaino